UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORLISS LEE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No. 13-cv-05458-VC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 35, 40 |

## Introduction

Corliss Lee has brought this suit against Metropolitan Life Insurance Company ("Metlife"), alleging breach of contract, breach of the implied duty of good faith and fair dealing, and violations of California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*, arising from Metlife's repeated denials of Lee's claims for benefits under a long-term care policy. The parties have filed cross-motions for summary judgment. Lee's motion is denied in full. Metlife's motion is granted in part and denied in part.

## Background

Lee's policy provided coverage for the cost of a caregiver in the event that a physical or mental disability prevented her from caring for herself. As is relevant to this case, Lee would be eligible for benefits upon giving Metlife satisfactory proof that she was "Chronically Ill."

> "Chronically Ill" means You are unable to perform, without Substantial Assistance from another individual, at least two (2) Activities of Daily Living ("ADL") for an expected period of at least ninety (90) days due to a loss of functional capacity; or You require Substantial Supervision to protect You from threats to health and safety due to Severe Cognitive Impairment.

White Decl., Ex. B at MET-LEE 000026.

Between April 2008 and November 2011, Lee filed four claims for benefits under the

policy. Metlife denied each claim. Twice, Lee appealed the denials though Metlife's internal appeals process. In both appeals, Metlife upheld its decision. Although each of Lee's claims for benefits included some evidence suggesting she experienced difficulty performing certain "Activities of Daily Living," Lee now only contends she was eligible for benefits due to Severe Cognitive Impairment.

The policy defines "Severe Cognitive Impairment" as:

> [A] deterioration or loss in intellectual capacity that: (a) places You in jeopardy of harming Yourself or others and, therefore, You require Substantial Supervision by another individual; and (b) is measured by clinical evidence and standardized tests which reliably measure impairment in: (1) short or long-term memory; (2) orientation to people, places or time; and (3) deductive or abstract reasoning.

White Decl., Ex. B at MET-LEE 000026. Thus, to qualify for benefits under the policy's "severe cognitive impairment" provision, Lee was required to show that:

1. she suffered from a deterioration or loss of intellectual capacity as measured both by clinical evidence and by standardized tests that reliably measure impairment in short or long term memory, orientation to people, places or time deductive or abstract reasoning;
2. as a result of this deterioration or loss of intellectual capacity she had become a danger to herself or others; and
3. she required continual supervision to alleviate this danger.

**Statute of Limitations**

Lee filed this lawsuit in November 2013. Metlife denied her four claims in May 2008, February 2010, July 2011 and July 2012. Under California law, claims for breach of contract are subject to a four-year statute of limitations. Cal. Code Civ. Proc. § 337. Claims for tortious breach of the duty of good faith and fair dealing are subject to a two-year statute of limitations. Cal. Code Civ. Proc. § 339; *see also Love v. Fire Ins. Exch.*, 271 Cal. Rptr. 246, 249 n.4 (Ct. App. 1990). Accordingly, Lee's breach of contract claims arising from the first two denials, and her bad faith claims arising from the first three denials, would fall outside these statutes of limitations.

But Lee's policy contains the following language: "No legal action may be brought until sixty (60) days after the written proof of claim has been given.  No such action may be brought after six (6) years from the time written proof of claim is required to be given."  White Decl., Ex. B at MET-LEE 000039.  This language stems from the California Insurance Code, which specifies that certain insurance contracts must contain limitations provisions of no less than three years.  *See* Cal. Ins. Code §§ 10350, 10350.11.  Lee argues that the six-year contractual limitation period in her policy supersedes the shorter statutory periods for breach of contract and bad faith claims, rendering all her claims timely.

An unpublished Ninth Circuit decision and a published decision from the Central District of California cut against Lee's argument.  The unpublished Ninth Circuit decision, *Flynn v. Paul Revere Insurance Group*, 2 F. App'x 885 (9th Cir. 2001), concluded without analysis that California's two-year statutory limitations period for breach of the covenant of good faith and fair dealing is not extended to three years by a contractual limitation provision included in the policy pursuant to the California Insurance Code.  The Central District decision, relying on *Flynn* as persuasive authority, offered a bit more explanation, holding as follows:

> Compliance with the contractual provision will not save a claim . . . where the statute of limitations has already expired.  This determination is supported by *Flynn* . . . , in which the Ninth Circuit . . . found the plaintiff's claim for tortious breach of the duty of good faith and fair dealing to be subject to the two-year statute of limitations provided by California Code of Civil Procedure section 339 rather than the three year policy provision . . . .

*Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1258 (C.D. Cal. 2003).

However, these decisions appear contrary to California law, which: (i) allows the insurer and insured to adopt policy language superseding any statutory limitations periods; (ii) requires that insurance contracts be interpreted as the layperson would read them; and (iii) requires that any ambiguity in an insurance contract be resolved in favor of the insured.

Both the above decisions relied on the Ninth Circuit's ruling in *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Insurance Program*, 222 F.3d 643, 648 (9th Cir. 2000), but that case involved a different situation.  In *Wetzel*, the insurance policy contained a three-year limitations period, and the Court was called upon to decide whether this three-year period could

supersede the longer four-year statutory period for breach of contract claims. The Court held that it could, and remanded the case to the district court to decide in the first instance whether the plaintiff's breach of contract claim was barred, on the facts of that case, by the three year limitations period contained in the policy. *Id.* at 650.

Here, Metlife makes a different contention, namely, that the shorter statutory limitations periods supersede the longer, six-year limitations period contained in the policy. But there is no language in the policy itself that would suggest the parties intended for the shorter statutory limitations periods to remain in effect. To the contrary, a policyholder reading the six-year limitations provision would likely conclude that she has six years from the deadline for submitting proof of a claim to sue based on any denial of that claim. *See Bischel v. Fire Ins. Exch.*, 2 Cal. Rptr. 2d 575, 579 (Ct. App. 1991) ("An insurance policy should be read as a layman would read it[.]"). To the extent there is any ambiguity on that question, California law requires the ambiguity to be resolved in favor of the insured. *See Kazi v. State Farm Fire & Cas. Co.*, 15 P.3d 223, 228 (Cal. 2001) ("Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations."). And it's clear that parties may agree to extend limitations periods beyond the periods contained in the applicable statutes. *Blue Shield of Cal. Life & Health Ins. Co. v. Superior Court* 120 Cal. Rptr. 3d 713, 723 n.11 (Ct. App. 2011). What would be the purpose of the six-year provision in Lee's policy if not to accomplish that objective? Metlife certainly did not identify one in its briefs or at oral argument on the cross-motions for summary judgment. And there is no language in *Wetzel* to suggest that when an insurer and an insured agree to the kind of language contained in Lee's policy—namely, language stating that no suit may be brought on the contract later than six years from the deadline for filing proof of a claim—that this does not reflect an enforceable understanding between the parties that they may sue on the contract any time prior to that deadline. Under these circumstances, the Court cannot conclude that Lee's claims are barred by the shorter statutory limitations periods.

**2008 and 2010 Denials**

Lee's claims arising from Metlife's May 2008 and February 2010 denials fail as a matter of law. It is undisputed that Lee suffers from severe bipolar disorder. But Lee points to no evidence

4

that, at the time of these denials, Metlife had any proof showing a deterioration or loss in intellectual capacity as measured by reliable standardized tests, which is one of the requirements to establish eligibility for benefits. Accordingly, the Court grants summary judgment in favor of Metlife on these claims.

### July 2011 Denial

In contrast, with respect to the July 2011 denial, a report Metlife received from its own assessor creates a genuine dispute of fact about whether Lee suffered from a severe cognitive impairment. The report was the product of an on-site evaluation of Lee's condition, conducted at Metlife's request in June 2011. As part of that evaluation, Metlife's assessor conducted a Mini Mental Status Examination ("MMSE"), a test that Metlife itself cites as an example of a standardized test that reliably measures impairment. Docket No. 40-1, p.6. Lee scored 26 out of a possible 30 on the test. White Decl., Ex. B at MET-LEE 000136. Arguably, this score indicates "a deterioration or loss of intellectual capacity." *See* Newman Decl., Ex. G, Lin Depo. at 14:21–15:6 (explaining that a score of "28 to 30 is considered normal"). And the report suggests the assessor may have believed that Lee's condition made her a danger to herself. It states that Lee was "easily confused," "easily disoriented," and had "poor memory." The report added that Lee "is not taking the proper meds – right time, etc." And the assessor wrote that Lee "needs a full time caregiver[.]" White Decl., Ex. B at MET-LEE 000161. Although this certainly does not prove that Lee had a "Severe Cognitive Impairment" within the meaning of the policy (which means Lee is not entitled to summary judgment), a reasonable juror could possibly infer that Metlife's assessor reached this conclusion (which precludes a grant of summary judgment in Metlife's favor on Lee's breach of contract claim). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### July 2012 Denial

There is also a genuine dispute of fact about whether, at the time Metlife denied her fourth claim, Lee had adequately shown that she was eligible for benefits. Lee filed her fourth claim in November 2011. In conjunction with this claim, Lee submitted the results of a neuropsychological assessment conducted by a psychologist, Janice DeCovnick, Ph.D., along with a cover letter from Lee's therapist, Lois Gradwell, in which Gradwell stated that she "strongly agree[d] with Dr.

5

1    DeCovnick's recommendation that Ms. Lee needs in home long term care." White Decl., Ex. B at
2    MET-LEE 000184. Metlife reviewed these documents, as well as records it obtained from Lee's
3    November 3, 2011 office visit with a neurologist, Dr. Janet Lin. In addition, Metlife sent Lee's
4    entire file for an independent medical review. *Id.* at MET-LEE 000105; *see also id.* at MET-LEE
5    00092; Newman Decl., Ex. G at LEE-LIN/NMGDV 000023. In January 2012, Metlife denied
6    Lee's claim. Paula Taylor, the agent who had sold Lee the policy, then filed an appeal on Lee's
7    behalf. In a letter dated July 16, 2012, Metlife upheld its denial. The letter stated that Metlife had
8    reviewed Lee's entire file, and that it had received no documentation that would alter its decision.
9    White Decl., Ex. B at MET-LEE 000106.

10    The evidence that was before Metlife as of July 2012 creates a conflict about whether
11    standardized testing indicated that Lee was cognitively impaired. Dr. DeCovnick's report detailed
12    a battery of tests DeCovnick performed on Lee over a series of several visits. DeCovnick opined
13    that these tests showed that Lee suffered from a significant loss of intellectual capacity in areas
14    including verbal memory. DeCovnick also opined that Lee suffered from dementia. White Decl.,
15    Ex. B at MET-LEE 000202–03. But DeCovnick's test results conflicted with a contemporaneous
16    MMSE examination conducted by Dr. Lin (in which Lee scored a perfect 30). Newman Decl., Ex.
17    G at LEE-LIN/NMGDV 000017. Dr. Lin also disagreed that Lee suffered from dementia. *Id.* at
18    LEE-LIN/NMGDV 000021. And while Lee's file also contained the report from Metlife's assessor
19    indicating that Lee had scored a 26 on the MMSE the assessor conducted in June 2011, Lee had
20    also scored a 29 out of a possible 30 on a similar standardized cognition test conducted at Stanford
21    Hospital later that same month. Newman Decl., Ex. E at MFCC 0054.

22    The evidence also is in conflict about whether Lee's possible impairment made her a danger
23    to herself. The evidence that Lee did indeed pose a danger to herself included a number of reports
24    detailing Lee's difficulties with managing her numerous prescribed medications. For instance,
25    DeCovnick's report stated that Lee "needs and should receive help with tasks requiring memory
26    . . . and . . . accuracy[,] such as taking medication." White Decl., Ex. B at MET-LEE 000203.
27    And Gradwell's cover letter to DeCovnick's report stated that Lee's "medications have been a
28    serious problem. She can forget to take them or take too much in a day – this has resulted in her

6

being hospitalized in order to get the medications correctly administered." Emmanuel Decl., Ex. I. Lee's file included a report from Lee's treating psychiatrist, Dr. Robert Picker, which stated that Lee had a history of four suicide attempts, including "one very serious attempt 7 years ago." White Supp. Decl., Ex. D. Her file also showed that, on at least two separate occasions between June 2011 and June 2012, Lee had been involuntarily admitted for psychiatric care as a danger to herself under California Health & Safety Code § 5150. On one of these occasions, Lee was admitted to John Muir Behavioral Health Center, experiencing "suicidal ideation with a plan to overdose." Emmanuel Decl., Ex. B; *see also* Newman Decl., Ex. G at LEE-GOULD 000154. Particularly given the fact that Lee's medications were prescribed at least in part to regulate her mood, *see* Newman Decl., Ex. E at Lois Gradwell MFCC 0056, a reasonable juror could conclude, based on the evidence of Lee's difficulties managing her medication and her prior suicidality, that Lee was a danger to herself as a result of her cognitive impairment.

Contrary evidence included a psychiatric evaluation conducted by Dr. Nagui Achmallah in July 2011, in which Dr. Achmallah reported that Lee was not suicidal, was "well-oriented to time, place, person and purpose" and that her "[i]mmediate recall, short-term and long-term memory are intact." Newman Decl., Exh. D., LEE-GOULD 00155. Other physicians also concluded that Lee was not suicidal. *See, e.g.*, *id.* at LEE-GOULD 000147; Newman Decl., Ex. J at LEE 001046. In her discharge summary following her June 2012 section 5150 admission to John Muir Behavioral Health Center, Dr. O. B. Towery reported that Lee was "alert and cooperative," there was "no evidence of delusions," and she was "well oriented to time, place and situation." At the time of discharge, Lee "was not felt to be a danger to herself," and in fact Dr. Towrey's report noted that Lee denied that she had any thoughts of suicide even at the time of her section 5150 admission. Newman Decl., Ex. J at LEE 001046–47.[1] Lee was discharged from John Muir Behavioral Health Center with no activity restrictions. And Dr. Eric Kaplan, the physician who conducted the independent review of Lee's file, concluded that "the current documentation does not support that

---

[1] Similarly, in a psychiatric evaluation conducted by Dr. Jerry Gelbart following Lee's section 5150 admission to John Muir Behavioral Health Center in July 2011, Dr. Gelbart reported that Lee had informed him that "she was not in any way suicidal," and that "the emergency room physician misinterpreted her." Newman Decl., Ex. J at LEE 000143.

7

Corliss Lee requires substantial supervision to protect herself from threats to health and safety due to severe cognitive impairment." White Decl., Ex. B at MET-LEE 000093–94.

Finally, the evidence is in conflict about whether Lee needed continual care to alleviate the danger that she would harm herself. Lee's file contained DeCovnick's report opining that Lee needed in-home long-term care from a caregiver, and Gradwell's letter voicing her strong agreement with this recommendation. Moreover, the report from the in-home assessment conducted at Metlife's request in 2010 stated that, in the opinion of Metlife's own assessor, Lee required continual supervision to protect herself to a threat to health or safety. Emmanuel Decl., Ex. G at MET-LEE 000342. Similarly, following Metlife's 2011 in-home assessment, Metlife's assessor stated "Lee needs a full time caregiver[.]" But given the conflict, discussed above, about whether Lee had established that she was in fact a danger to herself, these statements are insufficient to establish as a matter of law that Lee required continual care.

Given the evidentiary conflict on each of these points, a reasonable jury could go either way on Lee's claim that Metlife breached its contract when it upheld its decision to deny her benefits claim in July 2012. In contrast, with respect to Lee's claim for breach of the implied duty of good faith and fair dealing, there is no evidence in the record to support a contention that Metlife acted in bad faith (either in connection with the July 2012 denial or any of the prior denials). However, at the hearing on the cross-motions for summary judgment, Lee's counsel explained that he had been unable to schedule the deposition of Patricia Sullivan, the claims representative responsible for the decision to deny Lee's appeal in July 2012, after Metlife's counsel represented that he would produce Sullivan for deposition but then failed to do so. Because Sullivan's deposition could conceivably provide evidence in support of Lee's claim that Metlife acted in bad faith in connection with the July 2012 denial, the Court denies Metlife's motion for summary judgment that claim without prejudice to revisiting the issue at the pretrial conference. And because the merits of Lee's statutory claims are intertwined with Lee's bad faith claim, the Court similarly denies without prejudice Metlife's motion for summary judgment on the statutory claims.

**Conclusion**

Metlife's motion for summary judgment is granted in part and denied in part. It is granted with respect to Lee's first two claims for benefits, and with respect to the bad faith claim associated with Lee's third claim for benefits. The motion is denied with respect to the breach of contract claim brought in connection with the denial of the third and fourth claims for benefits. And Metlife's motion for summary judgment on Lee's bad faith and statutory claims with respect to the fourth claim for benefits is denied without prejudice to renewing motion at the pretrial conference, after Lee has had the opportunity to take Sullivan's deposition. Lee's motion for summary judgment is denied in its entirety.

**IT IS SO ORDERED**.

Dated: February 10, 2015

_____
VINCE CHHABRIA
United States District Judge